IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 3, 2014

## SAM E. STEVENSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-13-266      Roy B. Morgan, Jr., Judge**

**No. W2013-02656-CCA-R3-PC  - Filed October 10, 2014**

The petitioner, Sam E. Stevenson, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing he received ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined. JEFFREY S. BIVINS, J., Not Participating.

Kortney D. Simmons, Jackson, Tennessee, for the appellant, Samuel E. Stevenson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; James G. Woodall, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of facilitation of attempted first degree premeditated murder, aggravated assault, and especially aggravated kidnapping and sentenced to an effective term of fifty-three years in the Department of Correction as a result of his participation in assaulting, kidnapping, and setting fire to the victim, Freddy Jones. State v. Brian Montrel Brawner, Randy Leon Miller, and Sam Edward Stevenson, No. W2010-02591-CCA-R3-CD, 2012 WL 1572212, at *1 (Tenn. Crim. App. May 3, 2012), perm. app. denied (Tenn. Sept. 18, 2012). This court affirmed his convictions on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. Id.

On direct appeal, this court recited the underlying facts of the case as follows:

The three defendants lived in a garage apartment located at the rear of the Alexander Street residence in downtown Jackson in which the victim lived. According to the State's proof at trial, on the night of November 2, 2009, Defendant[] Brawner and [the petitioner] grabbed the victim from the front porch of his home, severely beat him, and carried him to the garage apartment. There, Defendant Miller poured rubbing alcohol over him and set him on fire. As the victim rolled around on the floor attempting to put out the flames, the defendants beat and kicked him. After the flames were extinguished, [the petitioner] placed the victim in a shower and ran cold water over him. The defendants then confined the victim in various places in the apartment until the next morning, when the defendants either fell asleep or passed out. At that point, the victim was able to escape and summon help.

**Trial**
**State's Proof**

The State's first witness at the defendants' September 2010 trial was a young neighbor of the victim's who witnessed the initial beating and kidnapping. Twenty-one-year-old Colton Forrest identified the victim's residence, 115 Alexander Street, as a "crack house" that was located just a few houses down from his family's home. He said that he and his brother were on the front porch of their home sometime between 10:30 and 11:00 p.m. on November 2, 2009, when they heard an altercation, looked toward the victim's house, and saw a white man being grabbed by the throat by a black man. Forrest stated that the first black man was joined by a second black man and that one of the two held the white man while the other one beat him. After two or three minutes, the two men picked up the victim and carried or dragged him down the driveway toward the garage. Forrest testified that his mother, who was a police officer, arrived home from work approximately ten minutes later and that he and his brother informed her of what they had witnessed. She, in turn, called the police.

Ricky Melton, Forrest's brother, corroborated Forrest's account, testifying that he saw two black men beat a white man in front of the victim's house for about five minutes before they picked him up and dragged him down the driveway toward the rear of the residence.

Officer Tommy Ferguson of the Jackson Police Department testified

-2-

that he responded to the scene shortly before midnight on November 2, 2009, but was unable to find any evidence of an assault. He spoke with several individuals who were sitting on the front porch of the residence at 115 Alexander Street, but he did not enter either the front or rear residence.

Sergeant Melanie Melton of the Jackson Police Department testified that she arrived home from work at approximately 11:20 p.m. on November 2, 2009, to be met in the driveway by her two sons, who relayed what they had just witnessed. She said she called dispatch at approximately 11:50 p.m., met Officer Ferguson outside when he arrived at the scene, and advised him to call another officer to assist because of what she knew about the victim's residence. She said that Officer Ferguson told her before his departure that he had not been able to find any evidence of an assault.

At approximately 9:30 a.m. the next morning, Sergeant Melton was awakened by the severely burned, weak-voiced victim knocking at her door. She described his appearance:

> One whole side of his face was just totally – just awful looking. His eye was swelled shut. He was burnt. His hair was burnt off all the way down his neck. His clothes were burnt to his skin. He was in his underwear and his underwear was burnt to his skin. He was in sock feet and they were burnt all the way down on the sides, and he was just kind of trembling like.

Officer Ted Maxwell of the Jackson Police Department, who responded to Sergeant Melton's house ten or fifteen minutes before the ambulance arrived to transport the victim to the hospital, testified that the victim told him that "Sam" and "Killer Bee" had burned him and pointed out the location where the burning had occurred. Officer Maxwell stated that he went first to the main residence of 115 Alexander Street, where he spoke with Eddie McCrae, who told him who was renting the garage apartment. He then went to the garage apartment, where he found three men and two women: Lewis Brawner, who answered the door; [the petitioner], who was hiding under the covers in a bed inside the apartment; Defendant Brian Brawner; Christina Coelsch; and Ashley Scruggs. Officer Maxwell identified photographs of the crime scene, which, he said, showed what appeared to be spots of blood in the driveway and inside the apartment. He stated that Defendant[] Brawner and [the petitioner] were the only two that were arrested at the scene. He did not hear the name of Randy Miller that morning, and Miller was not in the

-3-

apartment.

Kesha Gulish, the registered nurse who performed a triage assessment of the victim upon his 10:00 a.m. arrival at Jackson–Madison County General Hospital, testified that the victim had burns on his face, back, chest, and legs, was "writhing back and forth" on the EMS stretcher, and reported his pain level as ten on a scale of one to ten. The victim also reported that he had a history of marijuana, cocaine, and tobacco use and told her that he had been held at gunpoint all night after being burned with alcohol. As part of her assessment, she inspected his nose and mouth and noted that his nasal hairs were singed. She said that the victim remained at the hospital for a little over an hour before being transferred by helicopter to the burn center at the Regional Medical Center in Memphis.

On cross-examination, Nurse Gulish acknowledged that the victim reported that he usually consumed eight to nine quarts of alcohol daily. She further acknowledged that the victim's medical records reflected that he tested positive for cocaine at the time he was brought to the hospital.

Dr. Mario Figueroa, the emergency room physician who treated the victim at Jackson–Madison County General Hospital, testified that the victim had second degree burns over twenty-five percent of his body, which necessitated his transfer to the burn center in Memphis. The victim was in excruciating pain, and before his transfer Dr. Figuero[a] administered Dilaudid, the most powerful pain reliever he had. He also replaced the victim's lost fluids and gave him antibiotics to help prevent life-threatening infections.

Investigator Michael Parson of the Jackson Police Department, who was assigned to the Violent Crimes Unit in November 2009, testified that the victim first identified his three attackers while he was in the ambulance at the crime scene and then gave him a formal written statement at the Jackson hospital. Two of three individuals named by the victim, [the petitioner] and [Defendant] Brian Brawner, were present in the garage apartment, and Investigator Parson directed that they be taken into custody pending further investigation. Investigator Parson identified various pieces of evidence collected at the crime scene, including a dish towel with apparent bloodstains and a prescription pill bottle in the victim's name, both of which were found in a chair inside the apartment. On cross-examination, he testified that the story the victim gave him in the back of the ambulance was the same as the

-4-

one he gave him during the formal statement at the hospital, which was that he had been set on fire by "Sam" ([the petitioner]), "Killer Bee" (Defendant Brian Brawner) and "Bootsie" (Defendant Randy Miller). He said that no gun was found at the crime scene.

Nineteen-year-old Ashley Scruggs, who acknowledged that she was currently in jail for violating her probation in a cocaine possession case, testified that on the night of November 2, 2009, she was smoking marijuana and drinking alcohol in the garage apartment of 115 Alexander Street, which she described as a "drug house." She said that she was sitting on the couch inside the apartment when she heard the sounds of a scuffle, looked up, and saw the three defendants dragging the struggling victim by his arms into the apartment. She stated that after Defendant Brawner had shut and locked the door to the apartment, Defendant Miller announced his intention of burning the victim and then poured alcohol on him and set him on fire. Scruggs described the episode:

> After they had drug him in the house, [Defendant Brawner] shut the door, and he told everybody that was in there – he was like, "Can't nobody come in or go out," and [the victim] laid on the floor for a second, and [Defendant Miller] had said, "I'm gonna burn him." He said, "I'm gonna set him on fire. Where's the alcohol at," and . . . he got the alcohol off the table, and he poured it on [the victim] and set him on fire.

Scruggs testified that the victim, who lay on the floor burning for at least a minute, screamed and called out for God to help him. Finally, the three defendants, who were beating and kicking him during that time, "stomped [the fire] out." The defendants then set the victim on a chair in the corner near the bathroom and, because he complained of being cold, set a space heater near him and wrapped him in a sheet. Scruggs said that she tried to leave after the victim was set on fire but was stopped by a woman named Kirsten, who jerked her back by the arm and punched her in the eyes. She stated that the others in the apartment were afraid that she would go to the police and therefore ordered her into the back bedroom, where she eventually fell asleep. The next morning, she was awakened by the arrival of the police.

On cross-examination, Scruggs testified that the people in the apartment at the time the victim was burned, besides herself, the victim, and the three defendants, were a woman named Christina, the woman named Kirsten, and

Kirsten's sister, Jewell. Scruggs acknowledged that she never saw [the petitioner] do anything to the victim other than drag him into the apartment and then "try to put him out with his feet." She later made a similar acknowledgment with respect to Defendant Brawner's role in the incident. Finally, she acknowledged that she was not wearing her eyeglasses at the time she witnessed the victim's attack.

The victim testified that in November 2009, he was a cocaine addict and lived in the front residence of 115 Alexander Street, which was both a "crack house" and a house of prostitution, while the three defendants lived in the garage apartment out back. At about 10:30 or 11:00 p.m. on November 2, 2009, he was sitting on the front porch of his residence when Defendant[] Brawner and [the petitioner] grabbed him off the porch and kicked and beat him for what seemed like "forever." He was "pretty beaten up by then," and they picked him up by his arms and legs and carried him to the garage apartment and threw him on the floor. At that point, Defendant Miller came up behind him, threw alcohol over him, and set him on fire.

The victim testified that the pain was "unbearable" and that he rolled back and forth in an attempt to extinguish the flames. In the meantime, [the petitioner] and [Defendant] Brawner were both kicking him. The victim, contrary to Scruggs, characterized their actions as an attempt to prevent him from putting out the fire, rather then to help him extinguish the flames. He said that all his clothes were burned off his body and that when the flames were finally out, [the petitioner] picked him up and threw him into a cold shower, which caused him "[u]nbelievable pain." Afterwards, [the petitioner] and Brawner made him remain in the bathroom for "quite awhile," before they moved him to a back room, where they forced him to sit on a five-gallon bucket for two or three hours. Finally, the defendants allowed him to move to a recliner.

The victim estimated that he was confined in the apartment for approximately nine hours until all three defendants finally fell asleep or passed out and he was able to lift the chain off the door and escape. He said he tried to leave at one point before that, but [the petitioner] hit him in the face with his fist. He was also threatened by Defendant Brawner, who was armed with a pistol.

The victim testified that when he was able to get away from the apartment, he ran to the police woman's house four doors down and asked her

to call 9-1-1. The last thing he could recall before waking up in the Memphis hospital two or three days prior to Christmas was being airlifted from Jackson by helicopter. He was unsure of the total length of time he was hospitalized but said that he weighed only 94 pounds, down from his normal weight of 160 or 170 pounds, by the time of his release. The victim displayed his permanent scars to the jury and stated that his physicians had informed him that he would continue to experience pain for the rest of his life due to the fact that the nerve endings in his back had been burned.

On cross-examination, the victim acknowledged that there were other individuals besides the defendants in the garage apartment, including "Forty" and "Little Lewis." He further acknowledged that he said nothing in his statement to Investigator Parson about [the petitioner]'s having kicked him while he was on fire or having forced him to sit on a five-gallon bucket. He explained, however, that he was on morphine at the time he gave the statement. He also pointed out that he said nothing in the statement about [the petitioner]'s having put a cigarette out on the top of his head while he was in the back room but that [the petitioner] had done so. He testified that Defendant Miller left the apartment with a woman at one point during the night and thus did not, himself, physically prevent him from leaving the apartment. He further testified, however, that he was never left alone and that "[the defendants] had somebody there steadily watching."

### Defendants' Proof

Alicia Burgess, the victim's daughter, testified that the victim and Defendant Brawner had been friends in the past but that the victim had also at times been afraid of Brawner. She said that, to her knowledge, the victim did not owe Brawner any money. She acknowledged having spoken with [the petitioner]'s sister but denied having told her that the victim was going to testify that all that [the petitioner] and Brawner did to him was beat him up.

[The petitioner] attempted to have his sister, Liz Tamika McIntosh, offer two different pieces of testimony, both of which the trial court ruled inadmissable and instructed the jury to disregard: first, that the victim's daughter told McIntosh that the victim had said he was not angry at [the petitioner] and Brawner because they were not the ones who burned him; and second, that [the petitioner] and Brawner had partied at her house from around

midnight on November 2 until the next morning.[1]

Defendant Brian Brawner, who acknowledged that he had a 2006 conviction for possession of marijuana with the intent to sell, testified that he saw the victim off and on the evening of November 2, 2009, at both the main residence and the garage apartment. The victim had a vodka bottle in his hand earlier in the evening and was in his usual "high" and drunk state. Brawner stated that at one point that night he (Brawner) got into an altercation with a man named "Love," who then departed the scene with the victim. Brawner left as well but then returned with [the petitioner] and [Defendant] Miller after he received a phone call. When he returned, he got into a brief scuffle with the victim on the front porch of the main house. Brawner explained that he was angry because the victim failed to warn him that "Love" had returned to the house armed with a gun.

Brawner testified that he and the victim both fell down during their struggle and that several other men he did not know, including "Forty" and "Little Lewis," grabbed the victim and carried him toward the garage apartment. Concerned for the victim's well-being, he walked with [the petitioner] to the apartment, stepped in the door, and found the victim on the floor. Brawner said that he told the others in the apartment to calm down and leave the victim alone and then walked with [the petitioner] to the rear of the apartment to talk. When he turned around, he saw that the victim was on fire. Brawner testified that he and [the petitioner] immediately ran to the victim to help Miller, who was already attempting to put out the flames. He did not see anyone pour alcohol on the victim or set him on fire.

Brawner further testified that after the three of them had succeeded in extinguishing the fire, he helped the victim to the couch and gave him a sheet to wrap around him while Scruggs ran to get a heater, which she placed in front of the victim. The victim at first kept saying that he was in pain. However, he never asked for an ambulance and after about five or ten minutes, he calmed down and asked for some crack cocaine to smoke, which "Little Lewis" gave him.

Brawner testified that he and Miller were at the front house when the

---

[1] The trial court ruled the first piece of evidence inadmissible because it was hearsay and the second piece of evidence inadmissible because it constituted a partial alibi and the defendant had failed to provide notice of an alibi defense.

police arrived that night to investigate. However, neither of them reported that the victim had been burned or even talked to the officers. After the police left, [the petitioner] joined them at the front house, and Brawner and [the petitioner] then drove with Scruggs and Coelsch to Tamika McIntosh's house, where they remained for a few hours. They returned to the Alexander Street residence at 4:30 or 5:00 the next morning. The victim, who was sitting in a recliner in the garage apartment, asked for more crack cocaine, and "Little Lewis" gave him another "20 rock," which the victim shared with [the petitioner] and Coelsch.

Brawner denied that he had a gun with him on November 2-3, 2009, or that anyone prevented the victim from leaving the residence. He also denied that he told anyone to douse the victim with alcohol and set him on fire or that he knew about anyone else's plans to do so.

Officer Ted Maxwell, recalled as a witness for Defendant Miller, reiterated that the victim told him that he had sustained his injuries at the hands of "Sam" and "Killer Bee"; the victim never mentioned Miller to him.

Id. at *1-7.

On September 19, 2013, the petitioner filed a *pro se* petition for post-conviction relief. On appeal, the petitioner confines himself to arguing that counsel was ineffective for withdrawing the motion to sever his case from his co-defendants' and for failing to interview the victim and other potential witnesses. We will, thus, confine our summary of the evidentiary hearing to testimony that is relevant to those issues.

At the evidentiary hearing, counsel, an attorney with more than thirty-five years of experience, testified that he was appointed to represent the petitioner in the case in which the petitioner and two co-defendants were charged with attempted first degree murder, aggravated assault, especially aggravated kidnapping, and aggravated arson. Counsel stated that he initially filed a motion to sever the petitioner's case as a "knee-jerk reaction" to the case involving multiple defendants and a statement made by a co-defendant, but, after learning more about the case, he thought there were valid grounds not to sever. Counsel withdrew the motion after "thoroughly" discussing with the petitioner reasons it might be advantageous to go to trial with the co-defendants. They discussed that it would be unwise for the petitioner to testify given his lengthy criminal history but that one co-defendant, Brian Brawner, could testify and essentially "tell [the petitioner]'s version of the events without [the petitioner] having to get on the stand and testify." In addition, the other co-defendant, Randy Miller, appeared to be "the most culpable of the three . . . and we had hoped that

perhaps the jury would look at the relative involvement of [the petitioner] and Mr. Miller and perhaps that might be productive for [the petitioner]."

Counsel testified that he made the decision to withdraw the motion after confirming that the State would not introduce Defendant Miller's statement at trial, which included some statements against the petitioner's interest. Counsel said that he did not make the decision to withdraw the motion "unilaterally." He thought that going to trial with the co-defendants "was sound strategy." His theory of defense was that the petitioner was not involved in assaulting the victim and did not know that Defendant Miller was going to set the victim on fire. Counsel thought that Defendant Brawner's testimony at trial furthered their theory of defense without the petitioner's having to testify.

Counsel testified that he did not interview the victim or any of the State's witnesses prior to trial. However, counsel said that he had copies of their statements which he used to "exploit any inconsistencies in their trial testimony." He additionally cross-examined at least one of the State's witnesses at the preliminary hearing. Counsel said that the petitioner did not give him a list of people to interview before trial. Counsel was aware that there were other people in the house at the time of the incident, but the petitioner never asked him to talk to any of them. Counsel stated that he first heard of Tamika McIntosh during the trial when Defendant Brawner's trial counsel called her to testify; however, most of her testimony was excluded. Counsel did not know of any other witnesses who could have made a difference in the outcome of the trial.

The petitioner testified that he gave counsel a list of "people that he need[ed] to talk to." Specifically, he asked counsel to interview Kimberly Litton, Tamika McIntosh, and Bessie Lee Gause. He elaborated that Gause was his mother and that she would have testified that the petitioner came to her house after the incident. The petitioner claimed that he told counsel the specifics of what the three individuals would be able to testify, but counsel did not interview them. He also asked counsel if he interviewed the State's witnesses.

The petitioner testified that he wanted his trial to be severed from his co-defendants', and he and counsel discussed the issue. However, counsel did not come back to see him before the trial. The petitioner claimed that, at the beginning of the trial, he asked counsel what happened with the severance, and counsel told him that he forgot to file the motion. However, counsel reassured him, "[W]e all right. I think the more the merrier. I think we got it," so the petitioner "went with [his] lawyer" and agreed to not ask for a severance.

On November 6, 2013, the post-conviction court entered an order denying the petition for post-conviction relief. The post-conviction court found that counsel's withdrawal of the

motion to sever was a trial tactic that was consented to by the petitioner. With regard to the petitioner's contention that counsel failed to interview witnesses, the court observed that the witnesses were not called to testify at the hearing and it could not "speculate as [to] the nature of their testimony."

## ANALYSIS

Again, on appeal, the petitioner argues that counsel was ineffective for withdrawing the motion to sever his case from his co-defendants' and for failing to interview the victim and other potential witnesses.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687(1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

With regard to the motion to sever, the post-conviction court ruled as follows:

The proof before the Court is that trial counsel filed a severance and based upon trial tactics it was decided that the [petitioner] would receive a better benefit by going to trial with his codefendants because the [petitioner] could not testify due to the extensive number of prior convictions. It was apparent that one codefendant would testify and that that codefendant's testimony would to some degree help exonerate the petitioner. All of these issues were discussed by counsel and the petitioner prior to trial and it was agreed as the petitioner admitted in his testimony that he upon advice of counsel would agree that his motion to sever should be withdrawn in order to receive the benefit of his codefendant's testimony. The motion was withdrawn in open court on the record. This is sound trial tactics and was consented to by the petitioner and the court cannot now judge that matter from the vantage point of hindsight.

Although the petitioner disagrees with the post-conviction court's conclusion that counsel's withdrawal of the motion to sever was sound trial strategy, we conclude that the testimony at the evidentiary hearing supports the post-conviction court's determination. Counsel testified that he withdrew the motion after "thoroughly" discussing with the

petitioner reasons it might be advantageous to go to trial with the co-defendants, including that Brian Brawner's testimony could be helpful, even exculpatory, and Randy Miller appeared more culpable than the petitioner. Counsel said that he did not make the decision to withdraw the motion "unilaterally" and that he thought going to trial with the co-defendants "was sound strategy." Counsel provided his thought-out rationale for withdrawing the motion, showing that the decision was not uninformed or based on inadequate preparation. Therefore, the petitioner has failed to show that counsel rendered deficient performance.

With regard to the petitioner's assertion that he received ineffective assistance of counsel because counsel failed to interview the victim or other possible witnesses before trial, the petitioner failed to present the testimony of such witnesses at the evidentiary hearing and failed to present any evidence of how a pretrial interview of the victim would have aided his defense. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial or sentencing, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As such, the petitioner cannot meet his burden of demonstrating prejudice.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the petitioner has not met his burden of showing that he was denied the effective assistance of counsel. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-13-